### ANDREW SUNDAY V. THE STATE.

#### No. 3568. Decided May 26, 1915.

**1.—Murder—Evidence—Self-serving Declarations.**

Upon trial of murder, there was no error to rule out the declarations of the defendant and his brother to their respective wives, as they were not res gestae.

**2.—Same—Evidence—Rebuttal.**

Where, upon trial of murder, the State was using the fact that defendant and his brother had gone to a certain place and purchased buckshot shells, as a circumstance tending to show premeditation, it was permissible for the defense to show that their mission was a peaceful one and that they applied to the officers of the law to have the deceased put under a peace bond.

**3.—Same—Evidence—Rebuttal.**

Where, upon trial of murder, the State attempted to show that defendant and his brother waylaid and killed the deceased, and the defendant attempted to show self-defense from his standpoint, all the evidence which would aid the jury in determining which was the correct theory on this contested issue should have been admitted, including the testimony to show that defendant and his brother had been to see the witness and employed him to move them from the place to avoid further trouble with the deceased.

**4.—Same—Evidence—Co-defendant.**

Where defendant's brother was charged jointly with defendant with the murder of the deceased, he was not a competent witness for the defendant, although he had been adjudged guilty of manslaughter and his sentence suspended.

Appeal from the District Court of Montgomery. Tried below before the Hon. L. B. Hightower.

Appeal from a conviction of murder; penalty, eight years imprisonment in the penitentiary.

The opinion states the case.

*C. W. Nugent* and *J. T. Rucks* and *Dean, Humphrey & Powell,* for appellant.—On questions of declarations of defendant not self-serving: Everett v. State, 18 S. W. Rep., 674; Nelson v. State, 58 S. W. Rep., 107; Simmons v. State, 20 S. W. Rep., 573; Schauer v. State, 60 S. W. Rep., 249; Poole v. State, ·76 S. W. Rep., ·565; Pratt v. State, 53 Texas Crim. Rep., 281, 109 S. W. Rep., 138; Jackson v. State, 115 S. W. Rep., 256.

On question of rebuttal testimony: Davis v. State, 3 Texas·Crim. App., 91; Farrar v. State, 29 id., 250; Jackson v. State, 115 S. W. Rep., 262.

*C. C. McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was convicted of murder and his punishment assessed at eight years confinement in the penitentiary,. from which judgment he prosecutes this appeal.

It may be said to be conclusively proven that George Sunday, a brother of appellant, was a tenant of John Dunks, a man some seventy years of age; that while George Sunday and appellant, his brother, were gathering their cane crop some trouble arose between the landlord and tenant. Deceased, Jack Phillips, and George Rabun had married daughters of Mr. Dunks, and after the trouble between Mr. Dunks and George Sunday, the deceased and George Rabun went down into the field where the two Sunday boys were at work gathering their cane crop. Deceased and George Rabun were stout, able-bodied men, weighing 175 to 180 pounds each, while appellant and his brother, George, were small men, weighing from 120 to 130 pounds each. The State's witness George Rabun says that deceased went to the field fence and called George Sunday, telling him he wanted to see him; that Sunday replied, "If you want to see me you will have to come down here." Rabun and deceased then went down into the field, and Phillips (deceased) remarked, "Well, I see you have got one-half of the cane through," and George Sunday replied, "I am through with my part of it, and we are not going to have anything to do with the rest of it." That deceased then remarked, "I suppose you cursed old man Dunks yesterday and threatened to knock his brains out with a brush hook," George Sunday replying, "It is a damn lie, I didn't do any such thing." That deceased then knocked George Sunday down, calling him a "whore-house s—n of a b—h." Rabun says appellant interceded then and asked deceased not to strike George any more, when he told appellant, "Shut your mouth, you d—ned son of a b—h." That neither he nor deceased drew a knife, nor threatened to cut the throats of the two Sundays. That while they were talking to appellant and had turned to call Mr. Dunks, George Sunday left and went to his house; that believing he had gone for a gun, he and deceased left and went home.

Appellant says that his brother, George, and Mr. Dunks had had some words about the cane crop, but they had adjusted their differences. That deceased, Jack Phillips, and George Rabun came down in the field, and when they got down there "George Rabun taken me in the collar with his hand and Jack Phillips taken my brother George in the collar and drawed their knives on our throats, and Jack Phillips told my brother, asked him how come him to take his cane knife to old man Dunks. My brother told him, says, 'Jack, I didn't take no cane knife to old man Dunks.' He says, 'You are a God damned lie, you did do it and Mr. Dunks says you did it.' He hit my brother up side the head with his fist and he reached and got a stalk of sugar cane off the wagon and hit him across the back of his head and told him, says, 'I will cut your God damned throat,' and knocked his head back with his arm and started to cut his throat; I said, 'Jack, please don't cut his throat.' He waved his knife at me, he says, 'If you say airy other word I will cut your God damned throat, you mother fucking son-of-a-bitch, from ear to ear.' George Rabun says, 'Yes, if you say airy other word I will cut your God damned throat.' Jack says, 'You are nothing but a set of God damned mother-fucking-sons-of-bitches, the whole business of you, women folks and all and mother.' I will tell you what he said about my mother; he told me my mother, sisters and wife were not nothing but a set of mother-fucking-sons-of-bitches; he says, 'God damn a man who would take it, you got to take it, you can't help yourself.' He told me, he says, 'You can't stay in that house nary nother night'; says, 'If you do we will kill every one of you.' He says, 'You can't stay there nary nother night.' When he was talking to George threatening what he would do to George I asked him not to cut George's throat, and he told me if I said ary nother word he would cut my God damn throat, you mother-fucking-son-of-a-bitch. George Rabun told me if I opened my head ary other time—said ary other word he would cut my throat from ear to ear. I guess George Rabun would weigh 180 or 190 pounds."

Appellant desired to prove what George Sunday told his wife when he got to the house, and what he, appellant, told George and his wife when he met them coming from the house. We do not think the court erred in excluding such statements. They were not res gestae of the killing, which took place the next day, and would be what is termed self-serving declarations.

Appellant testifies that when he started to the house he met George Sunday and his wife, and told George not to go back down there; that deceased and Rabun had said they were going after their guns and would kill them all, and that they had to move off the place; that George and his family at once left and went to their brother-in-law's, a Mr. Field; that he and George then went to Montgomery and saw the justice of the peace. The court would not permit him to testify what his mission was; what he said to the justice of the peace, nor what the justice said to them. And would not permit the justice to testify to what was said to him, nor what he said to appellant. How-

ever, he permitted the State to prove that they had gone to Montgomery, and had purchased a box of shotgun shells loaded with buckshot, and carried them home with them. If appellant had no explanation of why he purchased these shells it would be a most material fact to show murder upon express malice—that after the difficulty, they had gone direct to the town of Montgomery, purchased the buckshot shells and returned home, the killing taking place early next morning. Had appellant been permitted to do so, he would have testified that he and his brother went to Montgomery to have deceased put under a peace bond, and applied to the justice of the peace; that the justice declined to do so, when they purchased the shells to use in defense of themselves if it became necessary. In the bill of exceptions it is shown the justice of the peace would have testified, "That the defendant and the said Geo. Sunday came to the witness on the night preceding the homicide, in the town of Montgomery, some four and a half miles from the home of the defendant, and reported to the witness that they had been assaulted, abused and threatened by Geo. Rabun and the deceased, Jack Phillips, and that defendant and said Geo. Sunday sought of the witness to have the deceased, Jack Phillips, put under a peace bond for their protection, and that the witness and Constable Frank Rabun, who was present at the time, told the defendant and Geo. Sunday that it would make Jack Phillips worse to put him under a peace bond, and would increase the danger of them taking their lives, and the witness Davis, as justice of the peace, for that reason, declined to institute proceedings to have the deceased put under a peace bond."

As the State was using the fact that appellant and his brother had gone to Montgomery and purchased buckshot shells as a circumstance tending to show a predetermination to kill deceased, we think it was permissible for the appellant to show that his mission was a peaceable one, and that he applied to the officers of the law to have deceased put under a peace bond and thus avoid any further difficulty, and it was only after the justice of the peace had refused to institute peace proceedings that he had purchased the shotgun shells. If his trip to Montgomery was one to have deceased put under a peace bond and thus avoid all further difficulty between them, it was a commendable step to take, and this testimony should not have been excluded, and still permit it to be shown that he had gone to Montgomery and got shells that night, thus making his trip a hostile one, instead of one on a peaceful mission.

It being shown that George Sunday had been informed deceased had said if he did not move off of Dunks' place he would kill him, and Mrs. Sunday testifying that while appellant and his brother George were in Montgomery that deceased had come to appellant's house, and further testified that deceased had "asked us where George and Andrew Sunday were; that he came there to kill them and was going to kill them at first sight and had a good will to shoot us, and we slammed the door and they went on, and in just a few minutes we heard four guns fire just about 100 yards from the house," the defendant ought

to have been permitted to show by Mr. Ward that but a few moments before the killing the Sundays had been to him and employed him to move George off the Dunks place. This would have a tendency to show that they were seeking to avoid further difficulty, and as the State's theory of the case was that they had gone to Field's gin, hid themselves in some weeds and shot deceased as he drove by, we think their acts and conduct, which tended to show they were seeking to avoid a difficulty, should have been admitted in evidence. While the State's case would tend to show a way-laying, yet the evidence for the defendant is that after making arrangements to have George's things moved off the Dunks place, they were on their way to a relative's, and as they were going by the gin deceased drove up, stopped his wagon when he saw appellant and his brother, and when he did this, George Sunday remarked that he was not going to permit deceased to curse him and his family as he did the day before. Deceased dropped the wagon lines and reached for his hip pocket as if to draw a pistol, when both the Sundays fired. It is thus seen it was a way-laying from the State's standpoint; self-defense from apparent danger from the defendant's standpoint, and all evidence which would aid the jury in determining which was the correct theory on this contested issue should have been admitted.

The other bills present no error, and we do not deem it necessary to discuss but one of them. George Sunday had been tried, adjudged guilty of manslaughter, and the sentence suspended by the verdict of the jury. Appellant offered him as a witness, and says the court erred in excluding his testimony. Our Criminal Code provides that one charged jointly with the commission of an offense is not a competent witness, and certainly the conviction of his brother and suspension of the sentence did not render him a competent witness. He there stood charged with the offense, and it was not a case in which it is the final sentence that renders him incompetent as a witness, but the indictment that did so, and this being still pending against his brother, the court correctly held he was not a competent witness.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*